**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Michael Jones o/b/o | ) | |
| Jacqueline S. Jones, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 6:08-cv-03093-PMD |
| v. | ) | |
| | ) | |
| Michael J. Astrue, | ) | **ORDER** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff ("Claimant") brought this action, pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Social Security Commissioner denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. On January 14, 2010, in accordance with 28 U.S.C. § 636(b)(1)(B), the Magistrate Judge entered a Report and Recommendation ("R&R") recommending that the Commissioner's decision denying Claimant benefits be reversed and that the Claimant be awarded benefits. Defendant Michael J. Astrue ("Commissioner") filed an Objection to the R&R on January 22, 2010. Having reviewed the entire record, including Defendant's Objections, the court finds the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law. Accordingly, the court adopts the R&R's recommendation that the Commissioner's decision denying Claimant benefits be reversed and Claimant be awarded benefits.

# BACKGROUND

## A.  Procedural Background

Claimant filed her applications for DIB and SSI benefits on August 21, 2003 alleging that she became unable to work on April 7, 2003.  The applications were denied initially and on reconsideration by the Social Security Administration.  On July 9, 2004, Claimant requested a hearing.  Claimant, her attorney, and a vocational expert appeared before the administrative law judge ("ALJ") on May 19, 2006, and after reviewing the case *de novo,* the ALJ found that Claimant was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner when it was approved by the Appeals Council on July 9, 2008.  Claimant died prior to the Appeals Council's decision, and her husband subsequently filed this action for judicial review.

## B.  Evidence

Claimant was 47 years old at the time of the ALJ's second decision.  (Tr. 67.)  She completed high school and more than a year of college (Tr. 433) and has past relevant work experience as a nurse's aide, cafeteria worker, baker, and fast food worker. (Tr. 91, 431.)

### 1.  Medical Evidence Prior to the Relevant Time Period

In November 2001, Claimant presented to Dr. Danny H. Ford with complaints of bilateral wrist pain.  Dr. Ford diagnosed Claimant with carpal tunnel syndrome and prescribed a treatment plan involving activity modification, non-steroids, and night splints.  (Tr. 178.)

In September 2002, Claimant presented to the Tuomey Healthcare System Emergency Room with complaints of chest pain and shortness of breath.  She was diagnosed with musculoskeletal chest pain and discharged.  (Tr. 167-68.)  The following month, a cardiac

catheterization showed normal systemic hemodynamics (circulation), mild distal anterior and apical hypokinesis with preserved left ventricular ejection fraction, and no occlusive coronary disease. (Tr. 170.)

In December 2002, Claimant presented to Dr. Deli Wang for examination. She weighed 298 pounds. She reported that some diabetes medications—Glucophage and Actos—made her sick. She had regular heart rate and rhythm. Dr. Wang diagnosed her with type 2 diabetes mellitus (uncontrolled), obesity, hypertension and lumbago (lower back pain). He adjusted her insulin, prescribed an appetite suppressant (Phentermine), and instructed her to follow the 1,800 calorie American Diabetes Association diet, to check her blood sugar twice a day, and to exercise for 20 minutes per day. Later that month, Dr. Wang noted that Claimant was doing "better" with the adjusted insulin. In March 2003, Claimant presented to Dr. Wang with complaints of tender, swollen legs. Dr. Wang diagnosed her with edema. He prescribed a diuretic (Lasix) and a nonsteroidal anti-inflammatory (Bextra). (Tr. 206-09.)

## 2.    Medical Evidence during the Relevant Time Period

On April 7, 2003, Claimant presented to Dr. Wang with complaints of "acute lower back pain" (which radiated into her right leg) and malaise. (Tr. 205.) An MRI of her lumbar spine showed focal disc herniation at L5-S1 that slightly compressed the thecal sac. (Tr. 214.) Dr. Wang added a prescription for Vicodin. (Tr. 205.)

After undergoing a hysterectomy in late April 2003, Claimant made "minimal complaints of numbness" in her left thigh and pain in her lower left calf. (Tr. 138.) Several weeks later, she presented to the Tuomey Emergency Room with complaints of cramps and pain in her calves. Upon examination, Dr. Thomas J. Watts noted tenderness in her calf muscles, but no significant

3

swelling. Claimant was in no acute distress. Dr. Watts diagnosed her with muscle cramps, hypokalemia (low potassium), and hypomagnesemia (low magnesium), and instructed her to follow up with her primary care physician. (Tr. 160-61.)

Dr. Wang continued to treat Claimant during this time period. In May 2003, she complained of back pain and requested pain relief. Dr. Wang prescribed a nonsteroidal anti-inflammatory (Naproxen). Dr. Wang noted that Claimant's blood sugar was "good" (did not exceed 200 ml/DL). However, the following month he observed that her blood sugar was elevated over 400 mg/DL. (Tr. 201-04.) In early July 2003, Claimant presented to the Tuomey ER with high blood sugar. Dr. Watts diagnosed her with hyperglycemia and instructed her to follow up with her primary care physician. (Tr. 162, 201.)

In August 2003, Claimant presented to Dr. Ford for treatment of her carpal tunnel syndrome. Dr. Ford had not seen Claimant since September 2001. Claimant told Dr. Ford that she started having lower back pain in about May 2003, which progressed into her legs and was occasionally accompanied by paresthesia (tingling or numbness). Dr. Ford ordered an MRI of her lumbar spine, which showed right paracentral disc herniation at L5-S1 with suspected right S1 nerve root displacement and less pronounced "mild" broad-based disc bulges at L3-4 and L4-5. Dr. Ford subsequently performed a carpal tunnel release on her right wrist. (Tr. 173-79.)

At a follow-up appointment two weeks after the surgery, Dr. Ford noted that Claimant's wound looked good, and she had symmetric range of motion in her wrist and fingers and normal sensation. He released her to participate in activities "as tolerated," stating that he would see her back on an "as needed" basis. (Tr. 173.)

In September 2003, claimant presented to Dr. Rakesh P. Chokshi for evaluation of lower

back pain and bilateral leg pain. She stated that the pain worsened with bending, standing, and walking, and was relieved by bed rest, and was partially relieved by medication. Upon examination, Dr. Chokshi noted that Claimant had a "mild" limitation of range of motion in her lumbar spine and that extension produced some leg symptoms, although flexion relieved it. She had full 5/5 motor strength in her legs and normal, symmetrical deep tendon reflexes, but "mild" dysestehsia (abnormal sensation) in the L5-S1 distribution of her lower extremities to light touch. Lumbar spine films showed multiple degenerative changes at the L4-5 and L5-S1 levels. Dr. Chokshi gave Claimant an epidural injection at L5-S1 and prescribed pain medication. He noted that Claimant had not worked since April 2003, and stated that he would keep her out of work. (Tr. 235-36.)

Also in September 2003, Dr. Wang stated that Claimant had the following limitations: "no lifting or prolong[ed] standing." (Tr. 199.) Dr. Wang continued to treat Claimant through February 2004. (Tr. 190-97.) At that time, he completed a second report noting that Claimant had blood sugar levels over 500 and stating that she should have "limited physical activity." (Tr. 188-89.)

After Claimant continued to report pain in both her legs, Dr. Chokshi performed a bilateral discectomy of the L5 and S1 vertebrae in March 2004. (Tr. 181-85, 233.) In early May 2004, Dr. Chokshi stated that, although Claimant reported "some" lower back pain that was "mechanical in nature," her leg pain was "essentially gone," she had "no radiculopathy," and flexion and extension films showed that her lumbar spine was stable. Dr. Chokshi stated that Claimant should "stay active," encouraged her to lose weight and begin lumbar stretching and strengthening exercises, and instructed her to return in four weeks, "at which time she will be

ready to do some light duty type of work." However, Claimant failed to keep her appointment. (Tr. 231.)

In July 2004, Claimant presented to Dr. Derek R. Thomas and reported that she had been experiencing "really bad" chest discomfort for the past six months. Upon examination, Dr. Thomas noted an ejection systolic murmur in the apex. He assessed "chest pain suspicious for angina pectoris," hypertension, and a murmur in the mitral area. He prescribed nitroglycerin. (Tr. 247.) An echocardiogram performed that same day showed normal left ventricular size and global systolic function, aortic sclerosis, evidence of diastolic dysfunction, and "trivial" posterial pericardial effusion. (Tr. 250.) A subsequent SPECT study showed cardiomyopathy. (Tr. 248.) At a follow-up appointment the following month, Claimant reported that her chest pain was relieved with nitroglycerin. Dr. Thomas noted that her chest pain was consistent with angina pectoris. (Tr. 245.) He performed a cardiac catherization, which showed normal coronary arteries and "mild" cardiomyopathy. (Tr. 258-59.) At a September 2004 appointment, Claimant denied chest pain. Dr. Thomas prescribed Lisinopril (an ACE inhibitor), Toprol and blood pressure medication. He instructed Claimant to return in two months. (Tr. 244.)

In January 2005, Claimant presented at the Tuomey ER with complaints of cramping and chest pain. Dr. John Steven Basch diagnosed her with acute hypokalemia (noting that it was unclear whether she was supposed to be taking a potassium supplement) and a history of cardiomyopathy (Tr. 264-65.)

In August 2005, Claimant presented to Dr. Ugo Okereke for evaluation. Dr. Okereke noted that Claimant's diabetes was "not well controlled." He found it was "aggravated by missing meals, missing medications and poor diet, and relieved by insulin and medication." In

recording Claimant's social history, Dr. Okereke observed that she had "no particular diet." (Tr. 311-13.)

Upon examination, Claimant had normal strength in her arms and legs but decreased vibration sensation in her foot and a hypoactive ankle jerk. Dr. Okereke's assessment included uncontrolled diabetes mellitus (type 2), undiagnosed cardiac murmurs, peripheral neuropathy, and "unspecified hypertensive heart and renal disease, without mention of congestive heart failure or rental failure." Dr. Okereke prescribed Lisinopril and diabetes medication (Metformin and Novolog) and encouraged Claimant to follow a diabetic diet and comply with her medication. (Tr. 312.)

The following month, Claimant presented to Dr. Yongxin Li of the Carolina Diabetes and Kidney Center, Oakhill Osteoporosis Center, Sumter Medical Specialists, PA, for evaluation. Dr. Li noted that Claimant had not been to the clinic for three years. Claimant reported that she had been receiving diabetes treatment from another doctor, but that she "had not checked diabetes for a few months." Dr. Li noted that Claimant's blood sugar level had been "under reasonable control" during her prior treatment at the clinic. Claimant reported lower back pain and numbness in her feet. Upon examination, Dr. Li noted "trace" edema in Claimant's legs and observed that sensation in her feet was within normal limits. Dr. Li increased Claimant's insulin injections to four per day and stated that she would monitor Claimant's blood pressure, which was "high." Dr. Li advised Claimant to take Tylenol and Ultram (a narcotic-like pain reliever) for her back pain. (Tr. 281-82.)

The following week, Claimant returned to Dr. Okereke with complaints of abdominal pain and lower back pain (accompanied by numbness, tingling, and weakness in the legs). She

stated that the back pain was aggravated by lying still and lifting, but relieved by medication, back exercises, and movement. Upon examination, Dr. Okereke noted tenderness over the lumbosacral area, and Claimant reported pain with forward flexion during tests of the range of motion in her lumbar spine. The doctor noted decreased sensation in Claimant's thigh. X-rays revealed cardiomegaly (an enlarged heart) and degenerative changes in the lumbar spine. Dr. Okereke's diagnoses included lumbosacral radiculitis and abdominal pain. (Tr. 308-10).

Two days later, Claimant returned to Dr. Li, who noted that Claimant's back pain was "chronic" but "stable." Dr. Li noted that Claimant's diabetes had improved (although it was still elevated) and adjusted her insulin. (Tr. 280.) In October 2005, Dr. Li observed that Claimant's hypertension was "under reasonable control" and that her blood sugars were around 150 to 200. Dr. Li increased her insulin and diabetes medication. Claimant reported that her back pain had worsened in the last two weeks. Dr. Li noted diffuse tenderness in her lumbar vertebrae and prescribed a muscle relaxant (Skelaxin). (Tr. 279.) In early November 2005, Dr. Li again noted that Claimant's diabetes was improving, and stated that she tolerated her diabetes medication well. Her hypertension was also under good control. Claimant denied abdominal pain. Dr. Li again increased Claimant's insulin and started her on Elavil (an antidepressant) for diabetic neuropathy. (Tr. 278.)

However, about two weeks later, Dr. Li referenced Claimant's September 2005 blood sugar results in stating that her diabetes was "totally uncontrolled." Claimant's hypertension remained under control, and her energy level was "fair." Dr. Li advised Claimant to walk 15 minutes with meals, do water aerobics, decrease her starches, begin the 1,200 to 1,500 calorie ADA diet, and join a diabetes mellitus support group. (Tr. 276-77).

During the same time period, Claimant presented to Dr. Okereke and stated that, during the night, she experienced burning in her feet and numbness in her hands and feet. The symptoms were partially relieved by Vicodin. Dr. Okereke counseled Claimant about foot care and referred her for diabetic shoes. (Tr. 302-04). Dr. Okereke continued to treat Claimant in November and December 2005. (Tr. 296-301). In January 2006, Dr. Okereke completed a questionnaire stating that Claimant's condition was "currently stable at this time." He opined that she could sit for up to three hours and stand/walk for three hours in an eight-hour day and stated that she needed to get up and move around every three hours, for about 20 minutes. He rated her pain as a "4" out of "10" (10 being the most severe) and opined that she could frequently lift and carry up to 10 pounds, that she could tolerate moderate work stress, that her symptoms would periodically be severe enough to interfere with attention and concentration, and that she could not push, pull, kneel, bend, or stoop. (Tr. 284-91).

Claimant returned to Dr. Li shortly after the questionnaire was completed. Dr. Li noted that Claimant's diabetes had improved, although her blood sugars were "still around 200 a lot of the time." Claimant denied chest pain but reported numbness in her feet and pain in her hand and back. Dr. Li increased Claimant's insulin levels and noted that her hypertension was under control, that her edema and diabetic neuropathy had improved, and that she tolerated Elavil well. (Tr. 292-93).

Although Dr. Li had not previously diagnosed Claimant with carpal tunnel syndrome (Tr. 276-82), she noted that Claimant "still has a[ ] lot of hand pain and weakness" and advised her to see an orthopedic surgeon. (Tr. 293).

The next day, Claimant presented to Dr. Okereke with complaints of right knee pain. She

stated that the pain began two weeks earlier, that it was aggravated by sitting still, rest, lying in bed for long hours, and long car rides, and relieved by analgesic medication and Vicodin. Upon examination, Dr. Okereke noted crepiation (crackling or popping) in Claimant's right knee. (Tr. 294-95.)

State agency physicians Dr. J. H. Weston and Dr. Richard Weymouth reviewed Claimant's medical records in November 2003 and May 2004, respectively. Dr. Weymouth found that Claimant could occasionally lift and/or carry up to 50 pounds and frequently lift and/or carry up to 25 pounds; stand and/or walk (with normal breaks) about 6 hours and sit (with normal breaks) for about 6 hours in an eight-hour workday; had an unlimited ability to push/pull; and did not have any limitations on balancing, stooping, kneeling, crouching, or crawling. (Tr. 219-30).

### 3.    Hearing Testimony

At the hearing, Claimant testified that she was separated from her husband and that she lived with her three-year-old granddaughter, who had not yet started school. (Tr. 423, 425). She testified that her granddaughter had lived with her since she was born and that the child's mother had initially lived with her as well, but moved out in 2003. (Tr. 429-30).

Claimant testified that she experienced pain and mood swings as a result of her diabetes and experienced pain in her hand "quite often" as a result of carpal tunnel syndrome and diabetes. (Tr. 440, 453.) She testified that she took her insulin as directed and never missed an insulin shot. (Tr. 439.) She said that she "pretty much" followed a diabetic diet but that she occasionally ate a piece of cake or pie. (Tr. 456-57.) With regard to her heart, Claimant testified that she felt weak and that it took longer to complete tasks. (Tr. 441.) She said that she

experienced abdominal cramping each month following her hysterectomy. (Tr. 438.) She stated that her legs swelled about five times a week and that she elevated her feet to relieve the pain. (Tr. 455.) With regard to her back, she said that pain resolved after her March 2003 surgery but returned in 2006. (Tr. 449-50.) Claimant testified that the medication helped her pain but that it also made her sleepy. She rated her pain with medication as 7 out of 10. (Tr. 451.) She testified that she weighed 260 pounds. (Tr. 422.)

With regard to her functional abilities, Claimant initially said that she could only walk three to four feet, but later acknowledged that she is "not very good with measuring" and said that she could walk for 15 to 20 minutes. (Tr. 446-48.) She estimated that she could carry five pounds, and she stated that she had not picked up her granddaughter since the onset of her disability. (Tr. 443-44.) Claimant said that she could stand for up to 15 minutes at a time, sit for up to 20 minutes at a time, and bend to tie her shoes. (Tr. 445-46, 451.) She prepared food for her granddaughter and herself, did laundry, performed "light housework," washed dishes, vacuumed, drove, and shopped for groceries. (Tr. 426, 441, 443, 453-54.) Claimant testified that she would cook simple items like "TV dinners." (Tr. 454.) Claimant stated that she became light headed and dizzy when dressing herself. (Tr. 451.) Claimant testified that she had trouble with her hands after her carpal tunnel surgery including problems writing and problems brushing her hair. (Tr. 453-54.) With regard to her past work as a fast food worker, Claimant testified that she lifted less than five pounds. (Tr. 431-32.)

Vocational expert Dixon Pearsall testified that Claimant's past relevant work included the light, unskilled job of fast food worker and the medium, semi-skilled job of a nursing assistant. (Tr. 460.) The ALJ asked the vocational expert to assume an individual of Claimant's age,

education, and past work experience restricted to light work with no excessively dangerous or hazardous conditions. (Tr. 460-61.) The vocational expert testified that the hypothetical individual could perform the job of a fast food worker, parking lot attendant, weight tester, and inspector. (Tr. 462-64.) The vocational expert also testified that Claimant's skills as a nursing aide would transfer to the semi-skilled job of companion/sitter. (Tr. 462-63.)

### 4.     Appeals Council

Following the ALJ's decision, Claimant's counsel submitted medical records from Drs. Li and Okereke, as well as from Dr. G. Robert Richardson, to the Appeals Council. (Tr. 367-417.) Some of the material duplicated documents already in the record. (Tr. 397-414.) The medical records indicated that Claimant presented to Dr. Okereke in April 2006; he noted that she frequently forgot to take her medication and was not following her diet. (Tr. 394-96.) Later that month, Dr. Li noted that Claimant had not brought her home glucose monitoring record with her. Dr Li instructed Claimant to bring her blood sugar record on her next visit and spoke with Claimant about gastric bypass surgery because Claimant had not achieved her weight loss goals. (Tr. 384.)

In July 2006, Dr. Li noted that Claimant's diabetes was still uncontrolled and that Claimant had been taking the wrong dose of insulin. Claimant reported back pain; however, Dr. Li did not observe a significant neurological deficit. Claimant declined gastric bypass surgery. Her hypertension remained controlled. (Tr. 381.)

The following month, Claimant presented to Dr. Okereke with complaints of chest pain, which she reported was aggravated by exertion, walking and stress, and relieved by rest, sitting, and lying down. (Tr. 390.) Dr. Okereke's assessment was "unstable angina." (Tr. 391.) A

week later, he noted that the angina had "resolved." (Tr. 389.)

In September 2006, Claimant presented to Dr. Richardson for assessment of lower back and leg pain. She told Dr. Richardson that, while her 2003 back surgery resolved her pain, the symptoms had returned in about March 2006. Upon examination, Dr. Richardson noted that Claimant had normal muscle bulk and tone, full 5/5 strength, and symmetrical reflexes. However, she had positive straight leg raise tests and "mild but diffuse" lumbar paraspinal tenderness and spasms. Dr. Richardson did not observe any sensory deficits. X-rays revealed "mild" multi-level disc space narrowing. Dr. Richardson's assessment was lumbar radiculitis. (Tr. 416-17.)

In November 2006, Dr. Li noted that, although Claimant again failed to bring her home glucose monitoring record to the examination, her diabetes was "much improved," and her hypertension and back pain were both controlled. (Tr. 379.) Dr. Okereke also noted that Claimant's compliance with her diabetes treatment was "improving" and that, since her compliance had improved, her diabetes was responding. Dr. Okereke further noted that Vicodin helped Claimant's knee pain. (Tr. 386-87.) Dr. Li examined Claimant again in April 2007. (Tr. 373-76.) In May 2007, Dr. Li provided a statement on Claimant's behalf and completed another questionnaire. (Tr. 367-72, 377.)

Claimant died on September 1, 2007, as a result of respiratory failure and myocardial infarction. (Tr. 342.) Claimant's husband, Michael Jones, was subsequently designated as the substitute party on her behalf. (Tr. 347-66.)

## <u>DISCUSSION</u>

### I.     <u>Standard for Determining Disability</u>

A person is considered disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled, an ALJ employs a five-step inquiry:

> The first step determines whether the claimant is engaged in "substantial gainful activity." If he is, benefits are denied. If he is not engaged in such activity, the process moves to the second step, which decides whether the claimant's condition or impairment is "severe"—i.e., one that significantly limits his physical or mental ability to do basic work activities. If the impairment is not severe, benefits are denied. If the impairment is severe, the third step determines whether the claimant's impairments meet or equal those set forth in the "Listing of Impairments".... contained in subpart P, appendix 1, of the regulations.... If the claimant's impairments are not listed, the process moves to the fourth step, which assesses the individual's "residual functional capacity" (RFC); this assessment measures the claimant's capacity to engage in basic work activities. If the claimant's RFC permits him to perform his prior work, benefits are denied. If the claimant is not capable of doing his past work, a decision is made under the fifth and final step whether, in light of his RFC, age, education, and work experience, he has the capacity to perform other work. If he does not, benefits are awarded.

*Bowen v. City of New York,* 476 U.S. 467, 470-71 (1986) (citations omitted). Claimant bears the burden of proof at the first four steps of the analysis. At the fifth and final stage of this process, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work that exists in the national economy. *See Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

## II.    <u>The ALJ's Decision</u>

The ALJ concluded that Claimant is not under a disability and denied Claimant's application for DIB and SSI benefits.  At step one, the ALJ determined that Claimant has not engaged in substantial gainful activity since April 7, 2003.  (Tr. 21.)  Next, at step two, the ALJ found that Claimant has the following severe combination of impairments: diabetes mellitus and obesity.  (Tr. 21.)  However, the ALJ found that Claimant's obesity did not preclude the performance of basic work activity or limit "her ability to function or to perform routine activities within a work environment beyond the limitations included in her residual functional capacity."  (Tr. 22.)  The ALJ also noted that "Claimant's history of carpal tunnel syndrome, back pain, hypertension, and chest pain do not constitute 'severe' impairments, as that term is defined in the regulations."  (Tr. 22.)

At the third step, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  After determining in step three that the claimant's impairments do not meet one of the listed impairments, the process moves to the fourth step, at which the ALJ assesses the individual's "residual functional capacity"—this assessment measures the claimant's capacity to engage in basic work activities.  At this step, the ALJ found that Claimant has the residual functional capacity to: lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for about two-thirds of the work day; and sit throughout the work day.  The ALJ also found that Claimant cannot be exposed to excessively dangerous or hazardous work conditions.  (Tr. 22.)  The ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely

credible to the extent they are inconsistent with the residual functional capacity assessment. The ALJ found that the "clinical picture reflected in these treatment records shows rather limited objective findings to support the degree of limitations asserted by the Claimant." (Tr. 24.) The ALJ also found that Claimant's "inconsistent compliance with diabetic diets must be considered in assessing her credibility." (Tr. 24.) The ALJ ultimately concluded that "[a]fter careful review of all the evidence, the claimant's testimony as to pain and other subjective symptoms is not found to be credible to establish impairment of the disabling severity alleged." (Tr. 25.) As for opinion evidence of Claimant's treating physicians, the ALJ found that the opinions of "Dr. Wang, Dr. Okereke, and Dr. Li are not found to be supported by objective clinical findings or persuasive in evaluating the claimant's disability." (Tr. 25.)

Finally, the ALJ found Claimant is capable of performing past relevant work as a fast food worker. Additionally, while Claimant is able to perform some of her past relevant work, considering the Claimant's age, education, work experience, and residual functional capacity, the ALJ found that there are other jobs that exist in significant numbers in the national economy that Claimant can perform. Therefore, the ALJ concluded that Claimant "has not been under a disability, as defined in the Social Security Act, from April 7, 2003, through the date of this decision [September 8, 2006]." (Tr. 28.)

III.    **Magistrate Judge's Report and Recommendation**

Claimant filed the current action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of the final decision of the Commissioner denying her claim for DIB and SSI benefits. Claimant argues that the ALJ erred by (1) failing to properly consider the opinions of her treating physicians; (2)

16

failing to properly assess her residual functional capacity; (3) relying upon flawed vocational expert testimony; and (4) failing to properly evaluate her credibility.

First, the Magistrate Judge found that the ALJ failed to properly evaluate the opinions of Claimant's treating physicians, Drs. Wang, Okereke, and Li. The ALJ found that the opinions of those treating physicians were not persuasive in evaluating the Claimant's disability. Specifically, the ALJ indicated that no findings supported the opinion of Dr. Wang that Claimant could not perform any lifting. (Tr. 199.) The ALJ also noted that Dr. Okereke's report was inherently contradictory because even though it assessed a less than sedentary capacity (Tr. 284-91), it also indicated that Claimant was able to do a full-time job requiring activity on a sustained basis. Lastly, the ALJ found Drs. Li and Okereke gave opinions not supported by their own treatment records or objective findings. However, the Magistrate Judge found that, first, Dr. Wang "specifically cited clinical and objective evidence that [Claimant] was obese at 263 pounds, had 1+ edema, and MRI findings that showed she had a herniated disc in support of his conclusion that [Claimant] could not perform any lifting or prolonged standing." R&R, p. 19. Further, the Magistrate Judge found that the ALJ's finding that Dr. Okereke had stated that Claimant was able to do a full-time job is apparently a reference to transcript pages 288 to 289, wherein Dr. Okereke reported that Claimant's condition did not interfere with her ability to keep her neck in a constant position in a full-time job. As argued by Claimant, the Magistrate Judge found that "this is not surprising since [Claimant] had not claimed any disability relating to her neck." R&R, p. 19. The Magistrate Judge also found that Dr. Okereke's finding with respect to Claimant's neck is not inconsistent with the remainder of Dr. Okereke's findings, nor did the ALJ find any other inconsistencies. Lastly, the Magistrate Judge found that the ALJ ignored the

fact that Drs. Okereke and Li specifically noted abnormal diagnostic studies to support their findings. The R&R contains a thorough discussion of the inconsistencies in these doctors' opinions alleged by the ALJ, and that discussion is hereby incorporated by reference into this Order. See R&R, pp. 17-20. Therefore, the Magistrate Judge found that the ALJ failed to properly evaluate the opinions of those treating physicians.

Next, the Magistrate Judge found that the ALJ's residual functional capacity analysis and determination that Claimant could perform a range of light work is not supported by substantial evidence. The Magistrate Judge first noted that the ALJ improperly failed in finding that Claimant had no severe back impairment. The ALJ found that in March 2004, Claimant underwent back surgery and since that time the record failed to demonstrate complaints of any back pain. However, the Magistrate Judge found that the evidence does show complaints of back pain after the March 2004 surgery. R&R, p. 20 (citing Tr. 231, 279-80, 284, 308, 350, 378, 381.) The Magistrate Judge noted that "an impairment is severe when it is more than a slight abnormality that has more than a minimal effect on the ability to do basic work activities" and that the ALJ's finding that Claimant had no severe back impairment was in error. The Magistrate Judge also found that the ALJ failed to properly assess Claimant's residual functional capacity. "The ALJ noted that she 'considered' the opinions of the State Agency medical consultants that found [Claimant] could perform medium work, but disagreed, instead finding that '[t]he medical evidence as a whole more persuasively establishes an exertional capacity for light work. Yet, the ALJ failed to indicate any specific affirmative evidence that was consistent with such a finding." Therefore, the Magistrate Judge found that the ALJ's residual functional capacity analysis is not supported by substantial evidence.

Third, the Magistrate Judge found that the ALJ relied upon flawed vocational expert testimony. The Magistrate Judge found that the ALJ's conclusion regarding the Claimant's residual functional capacity, which the vocational expert relied upon in finding jobs Claimant could perform, was flawed. "The ALJ acknowledged in her decision that if the opinion of treating physician Dr. Okereke were given significant weight the vocational expert acknowledged that an individual with such limitations could not perform any work. As discussed above, Dr. Okereke's findings are consistent with the other treating and examining physicians. Accordingly, this court finds that the ALJ should have given deference to the vocational expert's testimony that such limitations preclude work." R&R, p. 22.

Lastly, the Magistrate Judge found that the ALJ failed to properly evaluate Claimant's credibility. The ALJ found that the record contained only "limited clinical findings" to support Claimant's alleged symptoms and found that Claimant was not compliant with diabetic diets. The ALJ also found Claimant's allegations of her alleged symptoms inconsistent with her testimony that she cared for her three-year old granddaughter, was able to cook simple meals, dress herself, and bend to tie her shoes. The Magistrate Judge concluded that the ALJ erred by requiring objective evidence at the second step of the credibility analysis and failed to take notice of numerous abnormal clinical and diagnostic findings recorded by her treating physicians. The Magistrate Judge also agreed with Claimant's argument that "the fact that she could cook simple meals, dress herself, and tie her own shoes, is hardly equivalent with an ability to work in a competitive job 40 hours a week." R&R, pp. 23-25.

Based upon the foregoing, the Magistrate Judge found that the record does not contain substantial evidence to support the Commissioner's decision denying Claimant DIB and SSI

benefits. Further, the Magistrate Judge found that because reopening the record for more evidence would serve no purpose, the Commissioner's decision should be reversed and Claimant should be awarded benefits pursuant to *Breeden v. Weiberger,* 493 F.2d 1002, 1012 (4th Cir. 1974).

## IV.    Standard of Review

### a.  Magistrate Judge's Report and Recommendation

The Magistrate Judge only makes a recommendation to the court. It has no presumptive weight, and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). Parties are allowed to make a written objection to a Magistrate Judge's report within ten days after being served a copy of the report. 28 U.S.C. § 636(b)(1). From the objections, the court reviews *de novo* those portions of the R&R that have been specifically objected to, and the court is allowed to accept, reject, or modify the R&R in whole or in part. *Id.* Additionally, the court may recommit the matter to the Magistrate Judge with instructions. *Id.* A party's failure to object is accepted as an agreement with the conclusions of the Magistrate Judge. *See Thomas v. Arn*, 474 U.S. 140 (1985).

### b.  Judicial Review under Social Security Act

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. The Act provides, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Although this court may review parts of the Magistrate Judge's R&R *de novo*, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings are supported by substantial evidence and whether the correct

20

law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). "Substantial evidence" is defined as:

> 'evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (alteration in original)).

## V.     Commissioner's Objections to the Report and Recommendation

The Commissioner first objects to the Magistrate Judge's finding that the ALJ erred in finding that Claimant did not have a "severe" back impairment in addition to the severe impairments of diabetes mellitus and obesity. Alternatively, the Commissioner argues that even if the ALJ erred in finding Claimant's back impairment was not severe, such error is harmless because the ALJ considered the back impairment during the later steps of her disability determination. The Court finds this objection to be without merit. The ALJ found that Claimant did not have a severe back impairment because the record failed to document complaints of any back pain after Claimant's March 2004 surgery. However, the Court agrees with the Magistrate Judge and finds that after a review of the record, Claimant specifically complained about her back pain beginning two months after her surgery and in September 2005, October 2005, January 2006, and July 2006. (Tr. 279-80, 284, 308, 350, 378, 381.) There is no indication in the record

that Claimant or any of her physicians found a significant improvement in her back pain after the surgery. Therefore, the Court finds that the Magistrate Judge was correct in stating that the ALJ erred in finding that Claimant's back impairment was not severe as that finding was not supported by substantial evidence. Further, the Court finds that this error was not harmless because the finding that Claimant's back pain was not severe influenced the ALJ's determination of Claimant's residual functional capacity at steps four and five of the sequential disability evaluation.

Second, the Commissioner objects to the Magistrate Judge's finding that the ALJ failed to properly evaluate Claimant's credibility. The Commissioner argues that the Magistrate Judge concluded that Claimant's failure to comply with diet and medications recommended by her doctors was one valid reason for discounting Claimant's credibility and that this single reason should be sufficient to uphold the ALJ's credibility determination. The Commissioner also argues that there are other valid reasons for discounting the credibility of Claimant's subjective statements that further support the ALJ's credibility determination including that the treatment records show "rather limited objective findings to support the degree of limitation asserted by the claimant" (Tr. 24), that there are inconsistencies between Claimant's testimony regarding her limitations and the record, and that Claimant's activities of caring for a toddler, cooking, vacuuming, laundry, and driving are inconsistent with her allegations of disabling limitations. The Court also finds this objection to be without merit and agrees with the Magistrate Judge that the ALJ failed to properly evaluate Claimant's credibility.

As discussed in the R&R, the Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a Claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater,* 76 F.3d 585, 593, 595 (4th Cir. 1996). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4. The Court agrees with the Magistrate Judge that the ALJ failed to take notice and explain the weight given to numerous abnormal clinical and diagnostic findings recorded in her treating physicians' notes that support Claimant's subjective statements. The Court also agrees with the Magistrate Judge's finding that "the ALJ's finding that [Claimant] cared for her three-year-old granddaughter is a 'significant gloss' on her testimony. [Claimant] testified that although she had guardianship over her three-year-old grandchild 'a lot of the time' her daughter was there to help her with the child, and the child's godmother took care of the child sometimes during the week and every other weekend.'" R&R, p. 25. Lastly, the Court finds that the fact that Claimant testified that she sometimes did not follow her diabetic diet does not alone amount to substantial evidence to support the ALJ's determination that Claimant's subjective complaints were not credible. The

23

ALJ is required to consider multiple factors when conducting a credibility analysis and must sufficiently make clear the weight that she gave to Claimant's statements and the reasons for that weight. SSR 96-7p. As noted by the R&R, the ALJ did not do that in this case. Therefore, the Court finds this objection to be without merit and adopts and incorporates the Magistrate Judge's finding with respect to the ALJ's credibility analysis.

Third, the Commissioner objects to the Magistrate Judge's finding that the ALJ failed to properly evaluate the opinions of Claimant's treating physicians, Drs. Wang, Okereke, and Li. The Commissioner argues that the ALJ properly found that the opinions of these doctors were inconsistent and were, therefore, not persuasive in evaluating the Claimant's disability. The Commissioner then points to a number of examples to support the ALJ's conclusion that these doctors' opinions contained inconsistencies and are therefore not persuasive. Again, the Court finds this objection to be without merit and adopts and incorporates the Magistrate Judge's finding with respect to the ALJ's failure to properly evaluate the opinions of these treating physicians. The Court also incorporates a thorough discussion of the inconsistencies in these doctors' opinions as alleged by the ALJ into this Order. See R&R, pp. 17-20. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. R&R, p. 17. After reviewing the entire record, the Court agrees with the Magistrate Judge as thoroughly discussed in the R&R that the opinions of Drs. Wang, Okereke, and Li do not contain inconsistencies and were therefore entitled to significant weight by the ALJ. Therefore, the Court agrees with the Magistrate Judge that the ALJ failed to give the opinions of Claimant's treating physicians the proper weight and therefore adopts the R&R's

analysis of this issue and finds Commissioner's objection to be without merit.

Finally, the Commissioner objects to the Magistrate Judge's recommendation that the case be remanded because "reopening the record for more evidence would serve no purpose." R&R, p. 26 (citing *Breeden v. Weinberger,* 493 F.2d 1002, 1012 (4th Cir. 1974)). Under Fourth Circuit precedent, reversal without remand is only appropriate where: (1) the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard; and (2) reopening the record for more evidence would serve no purpose. *See Breeden,* 493 F.2d at 1012. The Commissioner argues that in this case, reversal for calculation of benefits is not appropriate because the Commissioner's decision is supported by substantial evidence. The Court finds this objection to be without merit. As thoroughly discussed in the R&R, this Court finds that the ALJ's decision was not supported by substantial evidence. The ALJ failed to properly consider the opinions of Claimant's treating physicians; failed to properly assess her residual functional capacity; relied upon flawed vocational expert testimony; and failed to properly evaluate Claimant's credibility. The Court agrees with the Magistrate Judge and finds that the substantial evidence on the record as a whole indicates that the Claimant was disabled. Further, reopening the record would serve no purpose in this case—there are no inconsistencies in the record and further development is not required regarding the claim of the deceased Claimant. Therefore, the Court agrees with the Magistrate Judge's recommendation that the Commissioner's decision denying Claimant's application be reversed and that Claimant be awarded benefits. *See Breeden v. Weinberger,* 493 F.2d 1002, 1012 (4th Cir. 1974).

## CONCLUSION

After a review of the magistrate's Report and Recommendation, the objections filed by Commissioner, and the facts and record of this case, this Court finds the Report and Recommendation is based upon the proper law. Accordingly, the Report and Recommendation is adopted and incorporated in its entirety.

It is, therefore, **ORDERED**, for the foregoing reasons, that the Commissioner's denial of benefits is **REVERSED**, and the matter is **REMANDED** to the Commissioner for an award of benefits.[1]

**AND  IT IS SO ORDERED.**

**Charleston, South Carolina**
**March 31, 2010**

PATRICK MICHAEL DUFFY
United States District Judge

---

[1] "Should this remand result in the award of benefits, plaintiff's attorney is hereby granted, pursuant to Rule 54(d)(2)(B), an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*" Language taken from *Stutts v. Astrue*, No. 06-G-1476-NW, 2007 WL 1696878, at *5 (N.D. Ala. June 13, 2007).